UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: 3:07-CR-19 |
| | ) | (JORDAN/GUYTON) |
| BRAD SMITH, | ) | |
| a/k/a BRIAN SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. Defendant Brad Smith's Motion to Suppress Evidence [Doc. 13] is presently pending before this Court. This matter came before the Court for a hearing on July 3, 2007. Assistant United States Attorney Tracy Stone was present for the government. Federal Defender Kim Tollison ("Federal Defender Tollison") was present representing Defendant Brad Smith ("Defendant"), who was also present.

Defendant has been indicted [Doc. 1] on the following counts: one count of previously being convicted in courts of crimes punishable by terms of imprisonment exceeding one year and knowingly possessing firearms and ammunition, in violation of 18 United States Code Section 922(g)(1); and three counts (Counts 2, 3, and 4) of knowingly possessing a firearm, namely a "destructive device," as defined in 26 United States Code Section 5845(f), constructed from a 12-gauge shotgun shell, made in violation of Chapter 53 of Title 26, United States Code. These

1

charges arise out of the search of a residence at 355 Lone Mountain Road, Andersonville, Tennessee, on July 22, 2006.

## I. BACKGROUND

Defendant has moved to suppress (1) any and all evidence seized as a result of a search of his house on July 22, 2006, and (2) any and all statements made by him in response to the illegal search. [Doc. 13]. In support thereof, Defendant argues that the officers did not procure a warrant to search the house and that any statements made by Defendant, after the search, must also be suppressed as "fruit of the poisonous tree." [Doc. 14] In response, the government argues that the evidence was lawfully obtained pursuant to consent. Accordingly, Defendant's motion should be denied. [Doc. 20].

## II. FACTS

At the evidentiary hearing on this motion, the government called Deputy Robert Mansfield and Detective Darryl Chapman. The defendant did not call any witnesses.

### 1. Deputy Robert Mansfield

Deputy Robert Mansfield ("Deputy Mansfield"), of the Anderson County Sheriffs Department, testified that on July 22, 2006, he responded to a request for law enforcement assistance from a woman, Michelle McDaniel ("Ms. McDaniel"), claiming that she was the victim of domestic abuse. The call originated from 355 Lone Mountain Road, Andersonville, Tennessee. Deputy Mansfield testified that as he approached 355 Lone Mountain Road, he saw a woman with two children at a church, which was near the driveway of that address. He was in uniform. The woman motioned for him to stop, and he did. The woman was Ms. McDaniel, and she informed Deputy Mansfield that Defendant had struck her in the head and threatened to kill her and her kids if she

2

contacted law enforcement. Deputy Mansfield testified that Ms. McDaniel's ear was red and swollen, consistent with her complaints. She also informed Deputy Mansfield that Defendant had left the area, but that when he returned he would be under the influence of cocaine and heavily armed. Moreover, Ms. McDaniel told Deputy Mansfield that Defendant had previously told her he would not be taken alive by law enforcement. Further, if Deputy Mansfield or other officers went into the residence at 355 Lone Mountain Road, they should be careful; Defendant had booby-trapped the house with explosive devices, and two live grenades were inside.

Deputy Mansfield testified that he asked Ms. McDaniel if she resided at the house on a long-term basis, and she replied that she did. Deputy Mansfield then asked her for consent to search the house. Deputy Mansfield testified that she consented.

Deputy Mansfield testified that he then saw a vehicle approaching. He was the sole officer on the scene at this time. Ms. McDaniel said that the person in the vehicle was Defendant. Deputy Mansfield testified that he drew his firearm and ordered Defendant to get out of the vehicle. Defendant complied. Deputy Mansfield testified that he placed Defendant in handcuffs for officer safety, based on Ms. McDaniel's earlier statements. According to Deputy Mansfield, Defendant was not under arrest, but he was handcuffed so that Deputy Mansfield could control him while he investigated. Deputy Mansfield noted that Defendant did not appear to be under the influence of any drugs. Deputy Mansfield informed Defendant about Ms. McDaniel's statements alleging assault, and Defendant denied that he had assaulted her. Then, Deputy Mansfield told Defendant about Ms. McDaniel's allegations pertaining to explosives and booby-trapping in the residence. Defendant asserted that the allegations were false. Throughout his interactions with Defendant,

3

Deputy Mansfield stated that Defendant never threatened him and, though upset about the accusations, Defendant remained courteous.

Deputy Mansfield testified that he asked Defendant for consent to search the house. He said something to the effect of, "Do you care if we go up and make sure there's nothing dangerous up there," to which Defendant said something to the effect of, "Of course. You can see that there are no explosives up there." According to Deputy Mansfield's testimony, no other officers were on the scene, so no other officers witnessed this interaction.

Sergeant Baird, however, soon arrived on the scene, along with a number of other officers. Deputy Mansfield testified that he told Sergeant Baird about the consent, and Sergeant Baird requested that he obtain consent from Defendant in front of another officer/witness. Defendant had been placed in the back of Deputy Mansfield's police car, but the door had been left open. Deputy Darryl Chapman went to the car and heard Deputy Mansfield ask for and receive consent to the search.

Four officers went to Defendant's house, accompanied by Defendant. Ms. McDaniel and her daughters remained at the church with an officer. On arrival, the officers realized that the door to the house was locked. Deputy Mansfield testified that Defendant, though handcuffed, motioned to his front pocket and said something to the effect of, "Here, take the keys." Deputy Mansfield removed the keys, and the officers went into the house. Defendant was instructed to sit on the couch in the living room, and he did so.

Detective Mansfield testified that the officers began searching the house, looking for the grenades. Defendant informed them that long guns were in the bedroom closet. Deputy Chapman went to the bedroom closet to search it. Shortly thereafter, Deputy Mansfield testified that Deputy

4

Chapman announced that he had found a hand grenade in the bedroom closet. In response, Deputy Mansfield testified that Defendant said something to the effect of "My brother in law must have left that here." Detective Mansfield then asked if there was a second grenade to be found, since the officers had been told there were at least two grenades. Defendant replied, "What kind of grenade?" Detective Mansfield testified that he asked Defendant how many kinds did he have, and Defendant denied that there was anything dangerous on the premises.

All people exited the house. The grenade and the bag it was found inside were placed on the front porch. Deputy Mansfield testified that the officers called the Knox County Bomb Squad ("KCBS") for assistance. The KCBS took the grenade away from the house and detonated it. Detective Mansfield testified that the KCBS informed him that the grenade functioned as it had been designed to function.

After the grenade was detonated, the officers continued their search of the premises. Deputy Mansfield testified that in the bedroom closet, clothes, shoes, rifles, shotguns, large amounts of ammunition, and assorted weaponry were discovered.[1] Sergeant Baird asked Defendant if there was anything else that might blow up. Defendant responded that there were things in the detached garage which might blow up, but that they were used to make model rockets. Detective Mansfield testified that he then heard Sergeant Baird ask Defendant for consent to search the detached garage. Defendant gave consent. Deputy Mansfield and other officers then searched the garage. In the garage, they found several items which were identified by the KCBS as items which could be

---

[1] The Anderson County Sheriff's Department Receipt indicates that two shotguns, several rifles, an assault rifle, two pistols, ammunition, swords, tomahawks, numerous knives, and a bayonet were found in the bedroom closet. [See Exhibit 2 to the hearing]. Pictures of the assorted weaponry show that a rapier was also among the items discovered. [See Exhibit 4 to the hearing].

5

components of explosives, including mercury, metal pipes, cord, and explosive parts. Deputy Mansfield could not opine as to whether the items could also be used for model rocket construction.

Deputy Mansfield testified that, at no time, did Defendant limit or withdraw his consent to search. Deputy Mansfield also testified that the officers, contrary to Ms. McDaniel's assertions, never found any booby traps in the house.

On cross-examination, Deputy Mansfield testified that Defendant did not appear to be under the influence of drugs; that Ms. McDaniel talked with him for about ten minutes before Defendant arrived on the scene; that she said that the house at 355 Lone Mountain Road was her residence; and that she gave consent to search the residence. Deputy Mansfield again stated that he stopped Defendant at the nearby church, not at the residence, and that he questioned him there before going to the residence.

Deputy Mansfield testified that Defendant twice gave consent to search, and that when the officers and Defendant went to the residence, Defendant gave consent a third time before they entered the house. According to Deputy Mansfield, when they arrived at the house, he said to Defendant, "We want to make sure there is nothing here that would hurt someone." Defendant then gave consent to search, by saying "O.K."

On re-direct examination, Deputy Mansfield testified that at some point while everyone was still at the scene, it was determined that Defendant was a convicted felon. However, he does not recall exactly when, or by whom, that was determined.

2.  Detective Darryl Chapman

Detective Darryl Chapman ("Detective Chapman") was employed by the Anderson County Sheriff's Department on July 22, 2006.[2] He has been in law enforcement for over nineteen years. He testified that he responded to the incident involving Defendant. On arrival at the church, Detective Chapman found Defendant handcuffed and placed in the back of Deputy Mansfield's police car. Ms. McDaniel and her two daughters were also there. Detective Chapman testified that Defendant was upset about Ms. McDaniel's accusations, but was generally polite to the officers. He did not appear to be on cocaine.

Sergeant Baird arrived and requested that someone witness Defendant's verbal consent; Detective Chapman served as this witness. Detective Chapman testified that Deputy Mansfield walked over to the patrol car where Defendant was sitting and asked him if the officers could search the house for weapons. Detective Chapman testified that Defendant said something to the effect of "sure" or "fine," but, in any event, the response was in the affirmative.

Detective Chapman testified that, at the house, Deputy Mansfield again asked Defendant for consent to enter and search the house for explosives, to which Defendant again responded in the affirmative. Defendant also asserted that nothing dangerous was in the house. Defendant provided the key to enter the house, which was obtained from Defendant's pockets by Deputy Mansfield.

Detective Chapman testified that he began to search the house. In a bedroom closet, he found a homemade grenade in a bag. He found the grenade by placing his hand on it. Fearful of what might occur if he were to release his hand, Detective Chapman testified that he alerted all

---

[2] He is presently employed by the Campbell County Sheriff's Department and holds the rank of Detective/Sergeant.

others in the house of the grenade's presence, all exited the building, and he walked the grenade outside so that he could see it well. He gently placed the grenade on the front porch and got away. The grenade remained on the porch until the KCBS arrived.

After the KCBS came to the scene, took the grenade away, and detonated it, Detective Chapman testified that the officers resumed their search of Defendant's residence. Detective Chapman testified that Sergeant Baird asked Defendant for consent to search the detached garage, and Defendant consented. Detective Chapman testified that he heard this interaction. He also testified that Defendant never withdrew or limited his consent to search.

On cross-examination, Detective Chapman testified that Defendant was not high on cocaine, nor was he violent or threatening to officers. Detective Chapman repeated his testimony about hearing Defendant give consent twice – once while seated in a patrol car, and again at the residence. Detective Chapman testified that weapons and firearms were found in the master bedroom closet.

### III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Citizens also have the right to remain silent and the right to counsel under the Fifth and Sixth Amendments. Defendant contends that the officers did not procure a search warrant, and therefore the search, and subsequent statements, must be suppressed.

The Fourth Amendment requires a warrant to be issued to search a person's property or residence. However, an individual's voluntary consent to a search is an exception to the warrant requirement of the Fourth Amendment. A valid search may be made without a warrant and without probable cause if the person voluntarily consents to the search. Schneckloth v. Bustamante, 412 U.S. 218, 219, 228-29 (1973). "It is well-established that a warrantless search by law enforcement

officials will be upheld if a detainee has voluntarily consented to the search." United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998) (citing Schneckloth, 412 U.S. at 219). The government bears the burden of proving that the consent was voluntary and not "the result of coercion, duress, or submission to a claim of authority" based upon the totality of the circumstances. Id. The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. United States v. Worley, 193 F.3d 380, 385 (6th Cir. 1999). In determining whether consent was voluntary, the Court should consider the defendant's age, intelligence, and education level; if the defendant understood he had the right to decline to consent; if the defendant appreciated his constitutional rights; the nature and duration of the detention; and whether the officers used punitive or coercive conduct. Id. at 386.

In the present case, Deputy Mansfield and Detective Chapman testified that Defendant voluntarily consented to the search of the residence at 355 Lone Mountain Road, Andersonville, Tennessee. No evidence was offered to the contrary. Thus, this Court must determine whether: (1) Deputy Mansfield and Detective Chapman are credible witnesses and (2) whether the government has satisfied its burden of proving that the consent was voluntary.

1. Credibility

As noted above, the sole evidence offered was that Defendant voluntarily consented to a search of the residence at 355 Lone Mountain Road. This Court finds Deputy Mansfield and Detective Chapman to be credible witnesses. Neither officers' testimony has been impeached. In fact, each officer's testimony was in accord with that of the other. Defendant never asserted that he did not consent; he only asserted that the warrantless search was improper. However, as noted above, a search pursuant to an individual's voluntary consent is an exception to the Fourth

9

Amendment warrant requirement. Therefore, this Court finds, based on the testimony of Deputy Mansfield and Detective Chapman, that Defendant gave consent to the search.

2. Burden of Proof

As noted above, the government bears the burden of proving that the consent was voluntary and not "the result of coercion, duress, or submission to a claim of authority" based upon the totality of the circumstances. Van Shutters, 163 F.3d at 335 (citing Schneckloth, 412 U.S. at 219). The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. Worley, 193 F.3d at 385. In determining whether consent was voluntary, the Court should consider the defendant's age, intelligence, and education level; if the defendant understood he had the right to decline to consent; if the defendant appreciated his constitutional rights; the nature and duration of the detention; and whether the officers used punitive or coercive conduct. Id. at 386.

No evidence was presented of Defendant's age, intelligence, or educational level. However, no issue as to Defendant's age, intelligence, or educational level was raised by Defendant. There was testimony that Defendant had prior experience with the criminal justice system. Therefore, this Court determines that Defendant's age, intelligence, and educational level are sufficient to understand the concept of consent.

No evidence was presented that the officers used punitive or coercive conduct in obtaining consent from Defendant. "The absence of an overt act or threat of force, promises made to a defendant, or indications of more subtle forms of coercion that might flaw a defendant's judgment indicate that a defendant's consent was freely given." Morphis v. United States, 110 Fed. Appx. 527, 530, 2004 WL 2030043, at *2 (6th Cir. Aug. 31, 2004) (unpublished) (citing United States v.

Watson, 423 U.S. 411, 424 (1976)). Defendant consented while he was handcuffed and detained. However, a defendant's handcuffed and detained status does not suffice to demonstrate that consent was coerced. United States v. Evans, 225 F.3d 660, 2000 WL 799364, at *3 (6th Cir. June 12, 2000) (unpublished) (citing Watson, 423 U.S. at 424); see also United States v. Faulkner, 133 Fed. Appx. 298, 303, 2005 WL 1312858, at *5 (6th Cir. May 31, 2005) (unpublished) (holding that the mere fact that a suspect was detained in the police cruiser when he gave his consent to search did not automatically make the consent involuntary); United States v. Nappier, 155 Fed. Appx. 859, 867, 2005 WL 3196606, at *6 (6th Cir. Nov. 28, 2005) (unpublished) (holding that "'the fact of custody alone is not enough to demonstrate that the consent was coerced'") (quoting United States v. Blakeney, 942 F.2d 1001, 1016 (6th Cir. 1991)). Under a totality of the circumstances test, this Court does not find that the nature or length of Defendant's detention was unreasonable. United States v. Garmond, 116 F.3d 166, 171 (6th Cir. 1997). Accordingly, this Court finds that the officers neither employed punitive nor coercive tactics in obtaining consent from Defendant.

As to whether Defendant understood that he had the right to decline to consent or appreciated his constitutional rights, the Court has scant facts on which to base its opinion. Initially, the Court notes that "a defendant's knowledge of the 'right to refuse consent is a factor, but the government need not prove that the defendant had such knowledge to establish that consent was voluntary.'" Morphis, 110 Fed. Appx. at 530, 2004 WL 2030043, at *3 (quoting United States v. Erwin, 155 F.3d 818, 823 (6th Cir. 1998)). Police officers are not required to inform a defendant of his or her right to refuse to consent to a search, but a defendant's knowledge of that right to refuse is considered when determining whether, under the totality of the circumstances analysis, consent was voluntary. Fisher, 27 Fed. Appx. at 560-61, 2001 WL 1609935, at *3 (citing to Worley, 193 F.3d at 386-87).

A defendant's knowledge of his right to refuse consent may be established by prior arrests or other interactions with law enforcement. Faulkner, 133 Fed. Appx. at 303, 2005 WL 1312858, at *5 (noting that a defendant's personal knowledge of the criminal justice system, through his prior arrests, demonstrates his familiarity with the right to refuse consent). In the instant case, Defendant has previously been arrested; therefore, he has some familiarity with the criminal justice system.

In the absence of duress, coercion, or a lengthy non-consensual detention this Court finds that it is unlikely Defendant's consent was involuntary. The facts coupled with no indication of Defendant's inability to comprehend consent and understand whether to do so, leads this Court to the conclusion that Defendant's consent was voluntary, and that the government has carried its burden to the preponderance of the evidence in proving that said consent was voluntary. See Morphis, 110 Fed. Appx. at 531, 2004 WL 2030043, at *3 (finding consent was valid where: defendant had previously been arrested and was familiar with law enforcement procedure; no evidence was presented which showed that the defendant was uneducated or had limited intelligence; and no evidence was presented of threats of physical violence, coercion, or duress).

Additionally, the Court notes that no evidence was presented to indicate that Defendant protested the search of the residence once the search began. In fact, when asked about whether consent was ever withdrawn or limited, both Deputy Mansfield and Detective Chapman testified that no limitation or withdrawal of consent ever occurred. This evidence reinforces this Court's position that Defendant voluntarily consented to the search of the residence at 355 Lone Mountain Road. Faulkner, 133 Fed. Appx. at 303, 2005 WL 1312858, at *4 (holding that a magistrate judge's determination that consent was voluntarily given, based in part on the fact that the defendant did not protest the search once it began, was proper). In sum, this Court finds that Defendant voluntarily

consented to the search of 355 Lone Mountain Road.[3]

## IV. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and the relevant legal authorities, there is no basis to suppress the guns, ammunition, other weaponry, or destructive devices recovered from 355 Lone Mountain Road. Moreover, there is no basis to suppress any statements made subsequent to the search. For the reasons set forth herein, it is **RECOMMENDED** that Defendant Brad Smith's Motion to Suppress **[Doc. 13]** be **DENIED.**[4]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[3]This Court notes that there is evidence to indicate that Ms. McDaniel, a purported long-term resident of the house, also consented to the search. Because this Court finds that Defendant himself consented to the search, it is not necessary for the Court to determine whether Ms. McDaniel's consent would have been legally sufficient for the warrantless search of 355 Lone Mountain Road.

[4]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).